(No. 29180.—

ALUMINUM COOKING UTENSIL Co., Appellant, *vs.* ROBERT
L. GORDON, Director of Labor, *et al.,* Appellees.

*Opinion filed March 20, 1946—Rehearing denied May 16, 1946.*

WILLIAM BOOTH, of Pittsburgh, Pa., and SIDLEY, AUS-
TIN, BURGESS & HARPER, of Chicago, (EDWIN C. AUSTIN,
JAMES F. OATES, JR., HOWARD P. ROBINSON, and MARY V.
NEFF, all of Chicago, of counsel,) for appellant.

GEORGE F. BARRETT, Attorney General, (WILLIAM C.
WINES, and ALBERT E. HALLETT, both of Chicago, of
counsel,) for appellees.

Mr. JUSTICE GUNN delivered the opinion of the court:

This is an appeal from an order of the circuit court of
Cook county holding that one Hugh Chase performed ser-
vices for Aluminum Cooking Utensil Co., which would
require the latter to make contributions to the unemploy-
ment fund, as prescribed by the Unemployment Compen-
sation Act. The statute (Ill. Rev. Stat. 1945, chap. 48,
par. 242,) permits a direct appeal to this court.

The principal question involved is whether Chase was
rendering such services as, under the act, constituted "em-
ployment." Appellant, Aluminum Cooking Utensil Co.,
made certain kitchen equipment which was sold under the
name of "Wear-Ever." Equipment distributors were ap-

pointed and were provided with two sets of utensils, one in which to cook, and the other for display. These remained the property of appellant, but were loaned to the distributor, who gave bond for their return. Chase had purchased some utensils for demonstration, and also carried a small stock for sale. These utensils were sold by demonstration. The distributor would persuade a housewife to invite guests to a meal, which he himself, aided by his wife, would finance, prepare and serve. A sales talk would be delivered, and later a distributor would call upon the guests and attempt to make sales, and secure further engagements for demonstrations. If the sale was made the distributor would take orders, send them to appellant, the shipment being made directly to the customer. He received a commission, deducting same from the down payment. If the entire purchase price was not paid to the distributor, for those customers desiring credit, an arrangement had been made whereby these accounts could be financed by a separate but affiliated company.

In this case Chase signed a one-year contract, which was renewed several times. By this written contract he was appointed a distributor to sell "Wear-Ever" specialties in a defined territory. He was loaned a sample outfit for display, and given a price list of "Wear-Ever" goods. The distributor agreed to send in reports each week on a form furnished, and, upon failure to report, the company reserved the right to cancel the contract. The contract also contained the following provision: "It is further understood that the Company does not reserve any direction or control with respect to the Distributor's activities other than the right to question the sufficiency of the results accomplished by the Distributor as measured by the requirements of this contract." The distributor agreed, if he failed to average $100 per week in sales at retail prices, the company had the option to terminate the contract. The distributor further agreed in the event he gave away premiums in excess

of 6 per cent of the retail value of the goods, less his discount, the same would, at the option of the company, be charged to the distributor.

No set hours of work were required, and no direction over the work retained, although a school in salesmanship was maintained, which distributors were requested but not required to attend. There is some variance in the testimony of Chase and that of appellant, which is gone into with considerable detail by counsel on both sides. We conceive, however, that the status of the parties is governed very largely by the written contract, and in so far as is necessary we will refer to other pertinent facts in the course of the opinion.

A proper decision of the case involves the application of section 2(d), or, in the alternative, section 2(f)(5) (A)(B)(C) of the Unemployment Compensation Act. (Ill. Rev. Stat. 1943, chap. 48, par. 218.) As a preliminary to an analysis of the law applying to the facts, certain definitions contained in the act must be considered. Section 2(e)(1)(B) provides that after the year 1940 "'Employer' means * * * any employing unit which has * * * in employment six or more individuals within each of twenty or more calendar weeks." Then follow certain provisions applying to employing units, which have no substantial bearing upon the present case. Section 2(d) provides: "'Employing unit' means any individual or type of organization, * * * which has * * * in its employ one or more individuals performing services for it within this State." The balance of section 2(d) contains the test to determine whether a contractor or subcontractor, or its employing unit, becomes liable to make the contributions to the fund. Section 2(f)(1) provides: "'Employment' means any service performed prior to July 1, 1940, * * * by an individual for an employing unit, * * * without regard to whether such services are executive, managerial or manual in nature, and

without regard to whether such officer is or is not a stockholder or a member of the board of directors of the corporation." The remaining subparagraphs of section 2(f) are specific provisions relating to situations which are declared to come within, and others that are not included within, the term "employment," not here necessary to be enumerated. Section 18(1) provides "contributions shall * * * become payable by each employer" at certain rates. Prior to 1939 the statute provided that employment meant service performed for wages under any contract for hire, but the provision requiring wages is not now in the act.

From these definitions it may be seen that an employer and an employing unit are the same, except as to the number of individuals rendering service to it, as an "employer" must have at least six persons rendering services, whereas the "employing unit" requires no more than one. Since the term "employer" is constituted of employing units, there can be no contribution required under the statute unless there is an employing unit. The "employer" or "employing unit" under varying conditions must be determined from the language of the statute, as each of these terms under the act has a specific meaning.

The precise point for determination in this case is whether, under the facts, Chase was such a contractor or subcontractor as defined by section 2 (d) as to become the employing unit of those helping him; or, in the alternative, whether he was not in the employment of appellant because of the concurrence of facts enumerated in section 2(f)(5)(A)(B)(C), which, if they exist, would show Chase was not "in employment."

Confusion in applying sections 2(d) and 2(f)(5)(A) (B)(C) may be caused by considering or applying the rules of common law governing employer and employee to a matter which is controlled solely by statute law. The term "independent contractor" is not used in the act, but

under certain conditions set out in the act a relation which could properly be designated "independent contractor" is considered and removed from the designation "employment," with certain specific requirements as to what it takes to constitute the kind of independent contractor that does not come within the designation of being "in employment." It is necessary to consider the application of this relation in two places: first, in section 2(d), where the statute defines an "employing unit;" and second, in section 2(f)(5)(A)(B)(C), defining what service is not considered "employment." Since the contribution required by the statute is levied against "employers," (sec. 18(1),) and "employers" are made up of employing units, (sec. 2(e),) it follows there cannot be an employer unless there is an employing unit. Section 2(d) lays down the test to ascertain whether an employing unit, receiving service from a contractor or subcontractor, is receiving the benefit of services, or whether the contractor-subcontractor is the one receiving the services of others. If the latter is the case, and such contractor-subcontractor is independently established, and his services are available to others, the one liable to make the contributions is the subcontractor. (*New York Life Ins. Co.* v. *Murphy,* 388 Ill. 316; *Arrow Petroleum Co.* v. *Murphy,* 389 Ill. 43; *Beth Weber, Inc.* v. *Murphy,* 389 Ill. 60; *Gabel Mfg. Co.* v. *Murphy,* 390 Ill. 455.) In this sense an independent contractor under section 2(d) is not entitled to receive benefits, because the one for whom he works is not an employing unit, and so cannot become an employer. Thus, section 2(d), in defining the test of the employing unit, provides the reason no mention is made of the employment status of the contractor-subcontractor in the statute, because, depending upon facts, he is either an "employing unit" or "in employment," both of which are fully provided for in the act. On the other hand, section 2(f)(5)(A)(B)(C) is for the purpose of determining the employment status of an individual, since this sec-

tion provides "service performed by an individual * * * shall be deemed to be employment," except he comes within subparagraphs (A) (B) and (C).

The term "service" is not defined in the statute. It must be understood in the sense fixed by the statute after consideration of all its provisions. In a broad sense, a farm tenant may be considered as rendering service to the owner, but is specifically excluded by the statute. A blacksmith operating a shop may render service by piece or by contract. A builder may render service by constructing a house under contract. The blacksmith may be determined to be independent by virtue of section 2(f)(5)(A)(B)(C). The builder may be determined as the employing unit under section 2(d). The rendering of the service is not the controlling factor in these illustrations, and in neither case would the person hiring the services be considered an employer, because the law considers that the persons doing the work are rendering services for themselves, and hence have no employer required to make contributions.

Nor is there any disagreement in the cases as to what constitutes an independent contractor under both provisions of the statute. *Arrow Petroleum Co.* v. *Murphy,* 389 Ill. 43; *Beth Weber, Inc.* v. *Murphy,* 389 Ill. 60, and *New York Life Ins. Co.* v. *Murphy,* 388 Ill. 316, hold the presence of the concurrent requirements of section 2(f)(5) (A)(B)(C) makes the individual an *independent contractor,* and also hold that the contractor-subcontractor mentioned in section 2(d), under the conditions therein named, by becoming the employing unit, is placed in a like position. *Ozark Minerals Co.* v. *Murphy,* 384 Ill. 94, and *Gabel Mfg. Co.* v. *Murphy,* 390 Ill. 455, express the result in fewer words by saying the type of *independent contractor* who is not in employment is of the kind "as is by statute provided," or "as defined by statute."

Under the facts disclosed the distributor could have become the employing unit under section 2(d) of individuals

qualified to come within the term "employment," had there been any. However, it is agreed the only one rendering such service was the wife of the distributor. Such a person is not in employment under section 2(f)(6)(D), excluding "service performed by an individual in the employ of his son, daughter, or spouse."

This leaves for consideration the application of section 2(f)(5)(A)(B)(C). We have many times held that the concept of employment set out in the statute rather than the common-law conception applying to master and servant is controlling. (*Miller, Inc.* v. *Murphy,* 379 Ill. 524; *Rozran* v. *Durkin,* 381 Ill. 97; *Beth Weber, Inc.* v. *Murphy,* 389 Ill. 60; *Crouch* v. *Murphy,* 390 Ill. 112; *Van Ogden, Inc.* v. *Murphy,* 390 Ill. 133.) The three elements contained in section 2(f)(5)(A)(B)(C) must concur to not be deemed employment, though the facts might be more or less than sufficient to create a common-law independent contractor. *Van Ogden, Inc.* v. *Murphy,* 390 Ill. 133.

In *Gabel Mfg. Co.* v. *Murphy,* 390 Ill. 455, involving a written contract for the leasing of vending machines, we held the most generally accepted test of an independent contractor is said to be the right to control the manner of doing the work. Such, also, is one element under the statute, (sec. 2(f)(5)(A),) which reads: "Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact." The requirements of subparagraphs (B) and (C) of the same section might or might not be required to create the relation at common law, but are mandatory under the statute to exempt the individual from the status of being "in employment."

In the *Gabel case* we also held that where there is an unambiguous contract in writing it must be given the construction its words imply, and nothing can be added to or taken away from it to ascertain the intention of the parties. In the *Ozark Minerals Co. case* there were likewise written

contracts involved, signed by the persons claimed to be in employment and the owners of the mine. In each case it was held the contract provisions required a holding that the person claimed to be "in employment" was free from direction or control over the performance of the work, notwithstanding the other party had a right to give directions as to how he desired his material prepared, or where it was to be obtained, had the right to cancel the contract for unsatisfactory work, and controlled the method of payment, the worker being only responsible for results.

In the present case, provisions in the written contract for services, requiring the work to be performed within a given territory, and that reports be made of progress, and a provision for the adjustment of complaints and the fixing of prices and a sales quota are not inconsistent with the person being free from control in the *performance of the work*. Chase could use such hours as he chose; he could follow the recommended procedure for making the sales, or use his own judgment; he could acquire a stock of the same goods; and was paid for what he accomplished. The fact that a vendor of goods sold within a certain territory must produce a minimum amount of sales to retain his license does not have the effect of controlling the performance, *viz.*, the making of the sales. Many contracts other than those of employment contain clauses for cancellation, options, quotas, and other terms necessary to perform the contract. So far as the contract is concerned, there is nothing to prevent Chase from acquiring a business room and selling the wares from that point, or to employ persons to assist him. The method suggested by the appellant was simply something to aid in the sale of goods, in which, of course, appellant was interested, but not to dictate and control the method of sales.

The facts disclose that appellant did not retain the control of the performance of the work, which is one neces-

sary element to make Chase come within the designation "in employment." Nor is the fact he received his compensation by commission controlling. While we have held in certain cases that a person being paid by commissions was "in employment," it was not by reason of the fact, alone, that his compensation consisted of commissions, but by reason of the fact that either the employing unit retained control, or the individual in question was not excluded by subparagraphs (B) or (C) of section 2(f)(5).

There also seems to be no doubt but that the services performed by Chase came within that part of section 2(f) (5)(B) reading, "or that such service is performed outside of all the places of business of the enterprise for which such service is performed." Appellees take the position that the services by Chase were not outside the usual course of business, but overlook the alternative just quoted. Either of the two alternatives contained in section 2(f)(5)(B) is sufficient to satisfy the requirement.

It is also contended by appellees that Chase was not engaged in an independently established trade, business, occupation or profession, as defined by section 2(f)(5)(C). The contract between the parties did not prohibit the distributor from being engaged in another business, or in an independent business, and it could be performed in conjunction with another occupation. If the individual is, by contract and in fact, engaged in an independent occupation, and can also do the work he has been engaged to do, section 2(f)(5)(C) has been fulfilled. It appears from the evidence that in the present case some of the distributors had other jobs. One was a city fireman; another sold different types of merchandise; one was a contractor; and Chase himself had some kind of a job with the government, and part of the time did not sell at all, and sometimes sold on the side, and finally ceased selling because of the scarcity of aluminum, caused by government demands.

While appellees and appellant select from the evidence minute details claimed to establish their respective claims, it seems very apparent to us that the entire arrangement was governed by written contract, which provided that appellant have no control over the performance of the work, which was in fact performed outside of the places of business of appellant and while Chase was carrying on an independent occupation, even though the proof does not show to what extent such business was carried on.

The contract in writing was made some five years before the controversy arose. It was renewed on four different occasions, before complaint was made. It may be that in some small matters appellant and the distributor may have done things outside the terms of the contract, but these diversions, if they exist, were the acts of agents of appellant and Chase without any intent or claim that the written contract between the parties was abrogated, altered or changed. We are of the opinion that under the facts Chase was not "in employment," because he comes within the concurrent provisions of section $2(f)(5)(A)(B)(C)$.

The fact that we do not go into all the detail counsel for the parties have gone into in their respective briefs in analyzing facts does not mean we have not examined the same with care, but we feel it unnecessary to go into minutiae that do not change the general aspect of the situation.

The order of the circuit court of Cook county in affirming the decision of the Board of Review, and in quashing the writ of *certiorari,* is reversed, and the cause is remanded to such court, with directions to quash the record of the Board of Review filed in said case.

*Reversed and remanded, with directions.*